AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>Black TCL Cellphone, Castro, Brandon | Case No. 24-1397MB |

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

**As further described in Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**As set forth in Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before ___3/26/2024___ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>any United States Magistrate Judge on criminal duty in the District of Arizona</u>.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  3/12/2024 at 12:19 pm    _____
                                                *Judge's signature*

City and state: Yuma, Arizona                   Honorable JAMES F. METCALF, U.S. Magistrate Judge
                                                *Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is a Black TCL Cellphone (hereafter the "SUBJECT'S CELLULAR TELEPHONE"). The SUBJECT'S CELLULAR TELEPHONE is currently located at 4151 S Avenue A, Yuma, AZ 85365.

This warrant authorizes the forensic examination of the SUBJECT'S CELLULAR TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

*Property to be seized*

1. Any records and information found within the digital contents of the SUBJECT'S CELLULAR TELEPHONE that relate to violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (iii), including alien smuggling activity, and other communications of other illegal activity. Individuals involved in alien smuggling activity use these devices to coordinate the transport and housing of aliens, facilitate the collection and movement of currency, and communicate with members of the TCO known as La Mesa Crew and about the specific operations of that TCO.

   a. all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of drugs;

   b. all information related to the smuggling, transportation, transfer, and possession of undocumented non-citizens;

   c. all information related to buyers or sources of drugs (including names, addresses, telephone numbers, locations, or any other identifying information);

   d. all bank records, checks, credit card bills, account information, or other financial records;

   e. all information regarding the receipt, transfer, possession, transportation, or use of drug proceeds;

   f. any information recording schedule or travel;

   g. evidence indicating the cellular telephone user's state of mind as it relates to the crime under investigation;

   h. contextual information necessary to understand the above evidence.

2. Any records and information found within the digital contents of the SUBJECT'S CELLULAR TELEPHONES showing who used or owned the device at the

time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

☒ FILED ___ LODGED
___ RECEIVED ___ COPY

MAR 1 2 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY NM _____ DEPUTY

In the Matter of the Search of
Black TCL Cellphone, Castro, Brandon

Case No. 24-1397MB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 8USC1324(a)(1)(A)(v)(I) | Transporting/Harboring Illegal Aliens |

The application is based on these facts:

**See attached Affidavit of Border Patrol Agent Edgar Meledez-Diaz**

☒ Continued on the attached sheet.
☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Edward Arellano
*Ross Arellano Edwards*

*Edgar Melendez*
Applicant's Signature

Edgar Melendez  Border Patrol Agent- Intelligence
Printed name and title

Sworn to before me telephonically.
Date: 3/12/2024

Judge's signature

City and State: Yuma, Arizona

Honorable James F. Metcalf, U.S. Magistrate Judge
Printed name and title

## ATTACHMENT A

*Property to be searched*

The property to be searched is a Black TCL Cellphone (hereafter the "SUBJECT'S CELLULAR TELEPHONE"). The SUBJECT'S CELLULAR TELEPHONE is currently located at 4151 S Avenue A, Yuma, AZ 85365.

This warrant authorizes the forensic examination of the SUBJECT'S CELLULAR TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be seized*

1. Any records and information found within the digital contents of the SUBJECT'S CELLULAR TELEPHONE that relate to violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (iii), including alien smuggling activity, and other communications of other illegal activity. Individuals involved in alien smuggling activity use these devices to coordinate the transport and housing of aliens, facilitate the collection and movement of currency, and communicate with members of the TCO known as La Mesa Crew and about the specific operations of that TCO .

   a. all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of drugs;

   b. all information related to the smuggling, transportation, transfer, and possession of undocumented non-citizens;

   c. all information related to buyers or sources of drugs (including names, addresses, telephone numbers, locations, or any other identifying information);

   d. all bank records, checks, credit card bills, account information, or other financial records;

   e. all information regarding the receipt, transfer, possession, transportation, or use of drug proceeds;

   f. any information recording schedule or travel;

   g. evidence indicating the cellular telephone user's state of mind as it relates to the crime under investigation;

   h. contextual information necessary to understand the above evidence.

2. Any records and information found within the digital contents of the SUBJECT'S CELLULAR TELEPHONES showing who used or owned the device at the

time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Edgar A. Melendez, a Border Patrol Agent- Intelligence of the United States Border Patrol, being duly sworn, does depose and state the following:

### I. INTRODUCTION AND AGENT BACKGROUND

1. Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure, for a search warrant authorizing the examination of the cellular devices (hereinafter "SUBJECT'S CELLULAR TELEPHONE"), described below and in Attachment A, and the extraction of electronically stored information from that property, as further described in Attachment B. Because this affidavit is being submitted for the limited purpose of securing a warrant to search the property listed in Attachment A, I have set forth only the facts that I believe are necessary to establish probable cause to believe evidence of violations of Title 8 United States Code, Sections 1324(a)(1)(A)(ii) and (iii) (transportation and harboring of aliens) is contained in the property described below and in Attachment A.

2. I am a BPA-I with Department of Homeland Security/Office of Border Patrol (DHS/OBP), Yuma Sector Intelligence Unit. I have been a BPA since September 27, 2016, and currently serve as an Intelligence Agent with Yuma Sector Intelligence Unit.

3. On January 28, 2017, I completed the BPA Basic Training and basic law enforcement training at the Federal Law Enforcement Training Center in Artesia, New Mexico. I've been permanently assigned to two Border Patrol Stations in two different sectors. These stations include Laredo North Station in Laredo Sector and Yuma Sector Intelligence Unit in Yuma, Arizona. I was a member of the United States Border Patrol Collateral Intelligence Team and Field Intelligence Team (FIT) in Laredo, Texas, and a current member of the Yuma Sector Intelligence Anti-Smuggling Unit (ASU) in which I've gained much experience in the operations of various illicit smuggling organizations in various regions of the United States. I have been exposed to casework involving both alien and drug smuggling cases, along with the legal guidelines associated with this line of work. I have also gathered and interpreted criminal records, interviewed multiple principals and material witnesses, and properly executed the dissemination of information through the proper channels.

4.      I have obtained various certifications throughout my career with United States Border Patrol. I am certified on Subconscious Communication for Interview and Interrogation with the South Texas High Intensity Drug Trafficking Area (HIDTA). Also, I am certified as a Mobile Forensic Data and Recovery by MSAB through the United States Border Patrol.

5.      By virtue of my duties as an Intelligence Agent, I have performed various tasks that include, but are not limited to: (a) functioning as a surveillance agent, thus observing and recording movements of persons performing criminal acts, and those suspected of performing criminal acts; and (b) interviewing witnesses, cooperating sources and sources of information relative to the smuggling of aliens and the distribution of monies and assets derived from the smuggling of aliens (to include the laundering of alien smuggling proceeds).

6.      While conducting alien smuggling investigations, I have personally interviewed persons involved in the smuggling of aliens. I have consulted with other experienced investigators concerning the practices of alien smugglers and the best methods of investigating them. This Affidavit contains facts based both on my personal knowledge, and on information that I have obtained by conferring with other special agents and law enforcement officials involved in this investigation.

7.      The statements contained in the Affidavit are in part on information provided from your Affiant's personal knowledge and/or observations and from information as derived from the personal knowledge and/or observations of other sworn law enforcement official, either directly or indirectly through their reports or affidavits, surveillance conducted by law enforcement officials, analysis of public records, and analysis of financial and business documents. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all the relevant facts known to law enforcement officers. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all the relevant facts known to law enforcement officers.

## II. BASIS FOR PROBABLE CAUSE

8. On March 3, 2024, Border Patrol Agents - Intelligence assigned to the El Centro Sector Intelligence Anti-Smuggling Unit Group#2 (ASU) were conducting surveillance in Calexico, California. The ASU wears plain clothes and drive unmarked Service vehicles in order to blend in with the general public. ASU conducts surveillance and investigations on known smugglers and smuggling transportation cells operating in the Imperial Valley.

9. On this date, at approximately 5:30 p.m., the Calexico Border Patrol Station Remote Video Surveillance System Operator (841) observed two individuals walking northbound from the United States/Mexico International Boundary Fence (IBF) towards Interstate 8 (I8), west of the Brock Research Center Road Exit. Camera operators at 841 watched as the individuals entered the All-American Canal and swim north across the canal. This area is frequently used by alien smugglers to cross their human cargo due to the proximity to I8. Which offers immediate egress routes from the border. It is very common for alien smugglers in the area to telephonically guide illegal aliens from the IBF to I8 where an alien smuggler can pick them up and drive them to a safe house or motel. They will then wait to be transported further into the United States. It is illegal for the general public to swim in the All-American Canal.

10. ASU Agents were already in the area and would conduct surveillance to identify any vehicles that might try to pick the suspected illegal aliens. While ASU Agents parked their unmarked service vehicles in the area, 841 notified ASU Agents that the suspected illegal aliens were running towards I8. Border Patrol Agent (BPA) R. Alfaro observed a black Ford Expedition (Ford) bearing Arizona paper license plate 198804U stop in the eastbound lanes of I8, west of the individuals, and park with the hazard lights on. ASU Agents know from experience that alien smugglers will often drive around the area to ensure they are at the right pick up location and to ensure that there is no law enforcement in the area. 841 observed the two individuals run to I8 and concealed themselves south of the eastbound lanes of I8.

11. 841 and ASU Agents watched as the Ford began slowly travelling eastbound in the breakdown lane of the Interstate towards the two individuals. The Ford passed the two individuals and continued slowly travelling eastbound before again coming to a complete stop. As the Ford

3

again came to a complete stop, the two individuals ran south to the Ford, which was still parked in the breakdown lane with its hazard lights on.

12. 841 and ASU Agents watched the two individuals, later identified as John Doe 1 and Trinidad GONZALEZ-Garcia (GONZALEZ) run to the Ford and enter the rear passenger seats of the Ford. As the rear passenger door closed the hazard lights of the Ford turned off and the Ford merged back onto the eastbound lanes of I8 and continued travelling eastbound towards Yuma, Arizona. ASU Agents positioned their unmarked service vehicles behind the Ford and continued mobile surveillance. ASU Agents kept constant visual on the Ford as it travelled eastbound on I8 towards the Greys Well Exit.

13. The Ford continued travelling eastbound towards Yuma, Arizona, ASU Agents requested a fully marked Border Patrol Service vehicle to assist with a vehicle stop to perform an immigration inspection on all occupants. BPA R. Alfaro, who was dressed in full rough duty uniform and operating a marked service vehicle was following ASU Agents from a distance and responded. Border Patrol Agent-Intelligence A. Tapia and BPA D. Smith positioned themselves at the A7 Bridge with vehicle Immobilization Devices (spikes).

14. As the Ford approached the Greys Well Exit, BPA R. Alfaro activated his emergency lights and sirens. After activating the emergency lights and sirens, the Ford continued travelling at the same rate of speed in the fast lane. The Ford continued travelling eastbound towards the A7 Bridge and did not slow down or attempt to pull over into the slow lane. The Ford continued travelling eastbound at approximately 70 miles per hour. Additional ASU Agents and Calexico Border Patrol Agents joined in the pursuit, all with their emergency lights and sirens activated.

15. The Ford continued travelling toward BPA D. Smith and BPA-I A. tapia. As the Ford approached the A7 Bridge, the Ford swerved towards BPA-I A. Tapia while BPA D. Smith successfully deployed the spikes and the front driver's side tire was successfully immobilized. BPA-I A. Tapia was able to run to the south side of the Interstate and avoid being run over by the Ford. The Ford continued driving and lost the front driver side tire near Ogilby Road.

16. The Ford continued to evade Calexico Border Patrol Agents. SBPA-I M. Clinton positioned himself in the eastbound lanes of I8 at the Agricultural Checkpoint with additional

4

spikes. SBPA-I M. Clinton successfully deployed the spikes and the front passenger's side tire was successfully immobilized.

17. The Ford continued to travel at speeds ranging from 20 miles per hour to 75 miles per hour. The two immobilized tires began to shred and debris from the shredded tires began spewing in all directions along the eastbound lanes of I8. As the tires disintegrated, the Ford was left with two bare metal rims and two rear tires intact. Calexico Border Patrol Agents and ASU Agents continued to pursue the Ford.

18. Due to concern for the general motoring public as well as the occupants within the Ford, SBPA-I M. Clinton requested that Calexico Border Patrol Agents deactivate the emergency lights and sirens of their service vehicles as the Ford approached the 4th Avenue Exit. SBPA-I M. Clinton informed Calexico Border Patrol Agents that ASU Agents would covertly continue surveillance on the Ford if it continued travelling into the Yuma, Arizona city limits. Once the Ford exited I8 at the 4th Avenue Exit, Calexico Border Patrol Agents deactivated their emergency lights and sirens and terminated the pursuit. At this point, ASU Agents took the primary role of surveillance using their unmarked vehicles without emergency equipment activated.

19. ASU Agents kept constant visual on the Ford as it travelled through the city of Yuma. As the Ford approached the intersection of 6th Avenue and 5th Street, ASU Agents observed the front and rear passenger side doors open while the Ford continued to travel at a slow rate of speed. While the Ford made the west bound turn onto 5th Street, ASU Agents observed the front seat passenger, later identified as Brandon CASTRO (CASTRO) jump out of the Ford while the rear passenger GONZALEZ jump out of the moving vehicle. Both CASTRO and GONZALEZ immediately fell onto the concrete after jumping out of the Ford, which was still in motion then quickly attempted to abscond from the area. CASTRO and GONZALEZ were apprehended and secured after a brief foot pursuit. CASTRO was questioned as to his citizenship by BPA R. Daniels, CASTRO stated that he was a United States Citizen. GONZALEZ was questioned as to his citizenship by BPA J. Avina. GONZALEZ admitted to being a citizen of Mexico in the United States illegally. GONZALEZ admitted that he made the illegal entry by climbing the border fence in an area other than through a designated Port of Entry. GONZALEZ was not a give-up and attempted to evade capture and elude inspection.

20. While CASTRO and GONZALEZ were placed under arrest, ASU Agents continued to follow the Ford as it travelled west on 5th Street, and south on 8th Avenue. While travelling south on 8th Avenue, SBPA-I M. Clinton observed the unidentified driver jump out of the driver's seat of the Ford and another rear passenger jump out of the rear driver's side door. The vehicle was left in drive as the subjects bailed out and the now-driver-less vehicle continued southbound on the residential street. Agent Clinton ran and jumped into the vehicle and shut it off just prior to the vehicle striking a parked car.

21. John Doe 1 was taken into custody by BPA-I A. Tapia; however, the driver absconded from the area and after an extensive search, he was not located. John Doe 1 admitted to being a citizen of Mexico in the United States illegally. John Doe 1 admitted that he made the illegal entry by climbing the border fence in an area other than through a designated Port of Entry. John Doe 1 was not a give-up and attempted to evade capture and elude inspection.

22. GONZALEZ and John Doe 1 were placed under arrest for 8 USC 1325 Illegal Entry. CASTRO was arrested for 8 USC 1324 Alien Smuggling. All three were transported to the Calexico Border Patrol Station where their biographical data was entered into E3 NextGen.

23. While at the Calexico Border Patrol Station, during property inventory, CASTRO provided his address as 1925 South 3rd Avenue Space 7, Yuma, Arizona. The Ford was registered to the same address. CASTRO also sporadically stated that the Ford is his mom's car, and it was all him, and his mom is not involved in the event. CASTRO did not provide a statement without the presence of a lawyer and declined to provide consent to search his cellphone.

24. SUBJECT'S CELLULAR TELEPHONE was found on his person when he was arrested.

25. The SUBJECT'S CELLULAR TELEPHONE is currently in the lawful possession of United States Border Patrol (USBP). The SUBJECT'S CELLULAR TELEPHONE was seized during the incident to arrest. I seek this warrant out of an abundance of caution to be certain that an examination of the device will comply with the Fourth Amendment and other applicable laws.

26. The SUBJECT'S CELLULAR TELEPHONE is currently in storage at the Yuma Border Patrol Station at 4151 S Avenue A, Yuma, AZ 85365. In my training and experience, I know that the SUBJECT'S CELLULAR TELEPHONE has been stored in a manner in which the

contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT'S CELLULAR TELEPHONE first came into the possession of the United States Border Patrol.

### III. ITEMS TO BE SEIZED

27. Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found in the contents of the SUBJECT'S CELLULAR TELEPHONE.

28. Based upon my knowledge, experience, and training in Transnational Criminal Organization (TCO) investigations, as well as the training and experience of other law enforcement officers with whom I have had discussions, I know that individuals involved in alien smuggling activity tend to:

a) Retain records pertaining to financial transactions and the persons for whom the transactions are being conducted, including names and nationalities of smuggled aliens, as well as monies owed and/or paid for alien smuggling;

b) Collect data pertaining to other co-conspirators involved in alien smuggling activity;

c) Possess and maintain records reflecting bank transactions and/or money transfers relating to alien smuggling activity;

d) Maintain collections of records that are in digital or electronic format in a safe, secure, and private environment, including electronic communication devices (such as the Target Phones). These records are often maintained for several years in close proximity to the alien smuggler, usually at the individual's residence, to enable the alien smuggler to review the records, which are highly valued;

e) Correspond with and/or meet with other alien smuggling associates to share alien smuggling information and/or materials;

f) Retain correspondence from other alien smuggling co-conspirators relating to alien smuggling activity;

g) Maintain lists of names, addresses, and/or telephone numbers of individuals with whom the alien smugglers have been in contact and/or conducted alien smuggling activity.

29.     Based on my training and experience, as well as the training and experience of other law enforcement officers participating in this investigation and with whom I have conferred, I know that TCO utilize cellular telephones (such as the Subject's Cellular Telephone) to facilitate alien smuggling activity, and to communicate when conducting their illegal activity, utilizing the voice, text, and electronic mail (if accessible) functions of cellular telephones to do so. Individuals involved in alien smuggling activity use these devices to coordinate the transport and housing of aliens, facilitate the collection and movement of currency, and communicate with members of the TCO about the specific operations of that TCO. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including contact names and numbers of alien smuggling associates; call details, including call history, electronic mail (email) messages, text messages and/or text message history; and digital images of alien smuggling associates and/or activity. All this information can be used to identify and locate alien smuggling associates, identify methods of operation of the TCO, and corroborate other evidence obtained during the course of an investigation.

30.     In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the SUBJECT'S CELLULAR TELEPHONE.

IV.     **DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE**

31.     As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the SUBJECT'S CELLULAR TELEPHONES. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

32.     *Probable cause.* Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the SUBJECT'S CELLULAR TELEPHONES for at least the following reasons:

    a.      Your Affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and as a storage medium for evidence of the crime. The cellular telephone is an instrumentality of the crime

because it is used as a means of committing the criminal offense. The cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

        b.     Based on my knowledge, training, and experience, your Affiant knows that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

        c.     Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

        d.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      33.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the SUBJECT'S CELLULAR TELEPHONE because:

      a.      Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.      As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating, or exculpating the owner. Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used. For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet. Such information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may

either inculpate or exculpate the user of the cellular telephone. Last, information stored within a cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

    c.    A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

    d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

34.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise copying the contents of the SUBJECT'S CELLULAR TELEPHONE, including the use of computer-assisted scans.

35.    *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the

physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V.     CONCLUSION

36.     Your Affiant submits there is probable cause to believe probable cause to believe that the property listed in Attachment A (SUBJECT'S CELLULAR TELEPHONE) contains evidence related to the transportation and harboring of aliens, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (iii). For this reason, I respectfully request that this Court issue a search warrant authorizing a search of the SUBJECT'S CELLULAR TELEPHONE listed in Attachment A to seize the items of evidence listed in Attachment B.

*Edgar Melendez*
Border Patrol Agent-Intelligence Edgar Melendez
United States Border Patrol

Subscribed and sworn telephonically this 12th day of March, 2024.

HONORABLE James F. Metcalf
United States Magistrate Judge